Manchester SD v. Crisman          CV-97-632-M   03/26/01
                UNITED STATES DISTRICT COURT

                  DISTRICT OF NEW HAMPSHIRE


City of Manchester School District,
      Plaintiff

      v.                                  Civil No. 97-632-M
                                          Opinion No. 2001 DNH 061
Margaret Crisman, as
Surrogate Parent For Kimberli M.;
and The Town of Pittsfield School District,
      Defendants


                      **O R D E R**


      The Manchester School District ("MSD") appeals an

administrative decision by a state educational hearing officer,

finding that MSD continues to be liable for the cost of providing

defendant, Kimberli M., with a free and appropriate public

education.  See 20 U.S.C. § 1415(e)(2).  MSD says it is no longer

financially liable for Kimberli's education because, as of

January 1, 1998, Kimberli became a legal resident of Akron, Ohio,

by operation of N.H. Rev. Stat. Ann. ("RSA") Ch. 193:12,

II(a)(2).


      Because it equates "legal residency" with the right to

obtain a public education in this state, and because Kimberli is

no longer a legal resident of New Hampshire, MSD says it no longer must fund Kimberli's public education. The court disagrees, and, because neither party has addressed what may be material and disputed factual issues, and because potentially dispositive issues of law have also not been fully addressed, the pending cross-motions for summary judgment are denied, but without prejudice.

## Background

Kimberli M. was three months old when, in 1989, an accident (the parties do not say what kind) left her blind and severely disabled. At the time, Kimberli and her parents were residents of Manchester, New Hampshire.[1] Following several months of medical treatment in Manchester and Boston, Kimberli's parents placed her in the Brock Home, a "home for children" located in

---

[1] MSD does not agree, but that issue was finally decided in 1992 when the New Hampshire Department of Education determined that MSD was legally liable for Kimberli's special education costs. MSD did not appeal that ruling and it was necessary to the ruling that Kimberli (and probably her parents) were residents of MSD.

Pittsfield, New Hampshire,[2] where she has lived ever since. Some time after Kimberli's placement, her parents left New Hampshire, and, in 1995, they divorced. Kimberli's father, who currently resides in Akron, Ohio, was awarded sole legal and physical custody of Kimberli. Neither parent has had any substantial or meaningful contact with Kimberli during her residence in the Brock home for children. Given that circumstance, in 1993 the New Hampshire Department of Education (NHDOE) appointed Margaret Crisman as Kimberli's educational surrogate parent, to act on Kimberli's behalf with regard to her right to a free and appropriate public education.

In 1996 MSD sought (for a second time) to "discharge" Kimberli, that is, decline future financial responsibility for her public education. Based on her father's residency in Ohio, MSD asserted that the appropriate Akron, Ohio, educational authority was now responsible for providing Kimberli with an appropriate public education. Ms. Crisman objected on Kimberli's

---

[2] The parties agree that the Brock Home is a "home for children" as that term is defined in RSA 193:27, I. They do not, however, seem to agree that her parents independently "placed" her there. As will become clear, to the extent the term "placed" is legally significant, the degree and nature of state involvement in Kimberli's placement may matter.

behalf and requested a due process hearing to resolve the matter. The issue was resolved against MSD in an administrative proceeding before a NHDOE hearing officer, whereupon MSD filed an appeal in this court. While that appeal was pending, the New Hampshire legislature enacted a new statute defining legal residency for purposes of attending public schools in New Hampshire. Because the new statute had not been considered by the hearing officer, and seemed to raise significant issues that MSD (and the court) believed might be dispositive, the case was remanded to the NHDOE for further consideration. On August 4, 2000, the hearing officer again resolved the issue against MSD and, after a motion to reconsider was denied on November 20, 2000, MSD again filed an appeal in this court.

The parties have now filed cross-motions for summary judgment, arguing that the hearing officer's decision is, respectively, correct and incorrect, as a matter of law. Having carefully considered the hearing officer's decision and the pleadings, I believe both motions, as framed, must be denied. This court reviews the hearing officer's administrative decision under the "intermediate" standard described in Lenn v. Portland

4

School Committee, 998 F.2d 1083, 1086-87 (1st Cir. 1993).

Applying that standard, it appears likely that the hearing officer's decision is probably correct, albeit perhaps for reasons only slightly different from those given. But, it may be that additional evidence needs to be developed before summary judgment becomes available.

## Discussion

New Hampshire's statutes defining rights and obligations related to public education are hardly models of simple clarity, and require more than a fair degree of stamina to navigate. This case does not fully highlight the law's apparent ambiguities — but does present some intricate issues. The dispositive questions are simple enough:

1.  Does Kimberli enjoy a current right to a public education in Pittsfield, New Hampshire?

2.  Does MSD have to pay for it?

It would appear, after more than several glances, that Kimberli's statutory rights and MSD's statutory obligations are not functions of her "legal residency" status at all, but depend instead on the meaning properly given to the terms "placed,"

5

"placement," and "original placement," as they are used in RSA Ch. 193.  It also may be the case that MSD is no longer in a position to challenge the validity of Kimberli's "placement" status, given its failure to challenge it when NHDOE made its initial determination of liability.

A short explanatory tour of the statutory thicket may reveal why summary judgment cannot be granted (at least not on the pleadings now before the court) as well as what potentially dispositive issues of fact and law might require additional briefing.

At bottom, this appeal presents issues of statutory construction, the analysis of which always begins with the language actually used in the statute.  If the language used in the statute is plain and unambiguous, courts need not look further for legislative intent.  Appeal of Booker, 139 N.H. 337 (1995).  Unless the statute itself suggests otherwise, words and phrases are to be given their usual and common meaning.  Id.; see also In re Cote, 144 N.H. 126 (1999).

With those principles in mind, we begin by considering the current state of the law, which generally conditions the right to attend New Hampshire public schools on school district residency, but admits of some exceptions. RSA 193:12, I, provides:

> Notwithstanding any other provision of law, no person shall attend school, or send a pupil to the school, in any district of which the pupil is not a legal resident . . . except as otherwise provided in this section. (emphasis supplied)

If school district residency is in doubt, one must look to RSA 193:12, II, which provides, in language pertinent to this case:

> For purposes of this section, the legal residence of a pupil shall be as follows:
>
> > (a) In the case of a minor, legal residence is where his or her parents reside, except that:
> >
> > > * * *
> > >
> > > (2) . . . If a parent is awarded sole or primary physical custody by a court of competent jurisdiction in this or any other state, legal residence of a minor child is the residence of the parent with sole or primary physical custody. If the parent with sole or primary physical custody lives outside the state of New Hampshire, the pupil does not have residence in New Hampshire.

7

To this point in the tour, then, the statutory language is plain and unambiguous.  Kimberli is not entitled to attend public school in Pittsfield, because: her father has sole legal and physical custody over her pursuant to a divorce decree; her father's legal residence is Akron, Ohio; and, by operation of the statute, as a minor child her legal residence (or "domicile") is that of her father – Akron, Ohio, not Pittsfield, New Hampshire.

However, the statutory provisions barring nonresidents from attending public school in New Hampshire's school districts is not absolute – it specifically acknowledges exceptions "as otherwise provided in this section."  RSA 193:12, I.  Subsection V of RSA 193:12 does indeed specifically "provide otherwise":

> V.  . . . nothing in this section shall limit or abridge the right of any child **placed** and cared for in any home for children, as defined in RSA 193:27 . . . to attend the public schools of the school district in which the home for children . . . is located, as provided in RSA 193:28. (emphasis supplied)

And, RSA 193:28 confirms that educational entitlement:

> **Right of Attendance**.  Whenever any child is **placed** and cared for in any home for children, . . . such child, if of school age, shall be entitled to attend the public

> schools of the school district in which said home is located, unless such **placement** was solely for the purpose of enabling a child residing outside said district to attend such schools . . . (emphasis supplied).

So, while it is true that Kimberli does not have a "legal residency" based right to attend public school in Pittsfield, she nevertheless may have an independent "placement based" right to do so — a right extended by statute to those children placed and cared for in "homes for children." That Kimberli is now, by operation of New Hampshire law, a legal resident of Akron, Ohio, for purposes of determining rights to public education in this state, then, is not determinative of the issues presented in this appeal. Whether she was placed, and is cared for in a New Hampshire home for children, <u>is</u> determinative. (Obviously, she was not placed in the Brock home solely for the purpose of attending public school in Pittsfield, since she was only seven months old when placed.)

Subsection X of RSA 193:12 assigns liability for the costs of educating pupils placed in homes for children, and provides:

> X. For the purpose of determining liability for a child **placed** and cared for in any home

9

for children . . . the provisions of RSA
193:29 shall apply. (emphasis supplied)

RSA 193:29, in turn, provides:

>    **Liability for Education of Children in Homes
>    for Children or Health Care Facilities.**
>
>    I.  For any child **placed** and cared for in any
>    home for children or health care facility,
>    the sending district shall make payments to
>    the receiving district . . . . (emphasis
>    supplied)

In this case the parties do not dispute that Pittsfield, where

the Brock home is located, is the "receiving district." As for

the identity of the "sending district" - the district obligated

to pay the cost of educating a child like Kimberli — RSA 193:27,

IV, provides:

>    IV. "Sending district" means the <u>school
>    district in which a child most recently
>    resided other than in a home for children</u>,
>    . . . <u>if</u> such child is not in the legal
>    custody of a parent <u>or if the parent resides
>    outside the state</u>; if the child is retained
>    in the legal custody of a parent residing
>    within the state, "sending district" means
>    the school district in which the parent
>    resides.  * * *  (emphasis supplied)

And, "[s]chool district means a school district in the state."

RSA 193:27, VI. That is, immediately before placement, the child

10

must have resided in a New Hampshire school district for a New Hampshire school district to be financially liable, as a "sending district," for the placed child's public education.

Accordingly, the plain language of the statutory scheme dictates that if Kimberli was "placed" in the Brock Home, a qualifying "home for children," then she is entitled to attend public schools in Pittsfield, and the cost is to be borne by the "sending district." Since Kimberli last resided in MSD before she was placed in the Brock home for children, and she is in the legal custody of a parent[3] who "resides outside the state," MSD is the "sending district," and remains liable for the costs of her public education in Pittsfield, the district in which the Brock home for children is located. The statutory language unambiguously leads to that conclusion.

---

[3] The court has been advised by plaintiff that Crisman has now been appointed legal guardian by a court of competent jurisdiction, the Merrimack County Probate Court, and that Crisman lives in Bow, New Hampshire. That development was not before the hearing officer in the administrative proceeding, and Bow is not party to this appeal. The statute speaks directly to such "changes in custody," but any disputes in that area are for another case and another day. See, e.g., RSA 193:27, IV.

11

The legislature, however, did not define the term "placed" as it is used in the statute. One can easily posit plausible alternative meanings. Perhaps the legislature meant the term to be understood as referring only to state administrative agency or court action taken to place a needy child in an appropriate setting, as authorized by law. If so, it hardly made that clear. Or, perhaps the legislature intended to include under the broad term "placed," action taken by private persons, like Kimberli's parents, to place their needy child in a qualifying home for children (particularly if intervention by the state is inevitable, or state agencies are fully cooperating or participating financially). Cf. RSA 170-A:1, Art.II(d) (defining "placement" as used in the Interstate Compact on the Placement of Children). The legislature no doubt understood that such parental placements are not lightly made, and that both residential and educational stability are critical to a disabled child's general welfare, no matter how the child came to be placed. But, if so, it hardly made that intent clear either.

As is often the case, New Hampshire's available legislative history is scant, providing little clue to the legislature's

12

intent or purpose in using the term, and shedding little light on whether alternatives were even discussed. Either interpretation is reasonable in a general sense, and certainly competing policy considerations would support either. The legislature could well have intended, for purposes of public education, to treat children placed in qualifying homes by their resident New Hampshire parents in the same way as children placed by the state or its courts. After all, resident children are entitled to a free and appropriate public education and if, due to genuine disability, a child is in need of residential services available only in another town or city, it makes perfect sense to provide that child's public education where he or she physically resides.

There are few decisions construing the statute, but the New Hampshire Supreme Court has held that the legislature's general purpose in enacting this child protection legislation included a desire to "ensure that the education of handicapped children 'will not be interrupted by disputes between school districts over their financial liability.'" In re Gary B., 124 N.H. 28, 32 (1983), quoting 1981 Senate Education Committee Minutes, HB 604,

May 12, 1981, prepared remarks of Rep. Taffe, p.1.  That legislative purpose no doubt underlies the statute's language authorizing children placed in homes for children to attend public school in the district in which the home is located, and also likely underlies its provisions protecting school districts in which such homes are located from the financial burdens that might otherwise accrue.

So, to fairly allocate financial responsibility for educating placed children, and protect host municipalities from incurring a disproportionate financial burden, the statutory scheme provides that, if a child placed in a qualifying home remains in the legal custody of his or her parents, and the parents live in New Hampshire, the financially responsible school district is the district in which the parents live, and not the school district in which the home is located.  If, on the other hand, the child's parents live outside New Hampshire, and the child was placed in a New Hampshire home for children when the child resided in New Hampshire, the financially liable "sending district" is the district in which the child "most recently resided other than in a home for children," and not the district

14

in which the home is located.  RSA 193:27, IV.  And, if, as is the case here, a child is placed by his or her parents while the parents and child are residents in New Hampshire, but the parents later move to another state, and the child remains in the legal custody of the parents, it follows from the plain language of the statute that the "sending district" remains "the district in which the child last resided before placement in a home for children."  RSA 193:27, IV.  The term "resided," as used in these specific provisions allocating financial liability, does not mean "legally resided," but instead means "was physically resident in."[4]

---

[4]  The New Hampshire Supreme Court has authoritatively construed the term "resided" as it is used in RSA 193:27, IV, as follows:

> 1)  . . . "resided" in this context refers to the place where a child actually lived (see Juvenile Case #1089, [119 N.H. 64 (1979)] rather than to legal residence or domicile;
>
> 2)  that the phrase "the district in which the child last resided before placement in a [facility]" means the place where the child most recently lived outside of a facility; [and]
>
> 3)  that these statutes apply regardless of the date on which a child was placed in a home for children . . . . In re Gary B:, 124 N.H. 28, 31 (1983).

The plain language of the statute makes it clear in Kimberli's case, then, that MSD is financially liable for her public education in Pittsfield, if she was "placed" in the Brock home, as the legislature contemplated. If the term "placed" is properly construed to include a voluntary placement by her parents, the result (MSD bears the cost of her education) is inevitable, and neither irrational nor absurd, since it insures the stability of a disabled New Hampshire child's residential and educational placement, so long as the child remains in a New Hampshire home for children. The legislature may well have determined that the cost and administrative effort associated with continually tracking absentee parents, as they move about from state to state, in order to identify and hold different foreign districts liable, militates in favor of accepting a disabled New Hampshire child who is placed in a home for children as a de facto resident, for educational purposes, until the age of majority.

The general statutory scheme is not free of ambiguity, and in other situations its plain language might dictate curious and odd results. But, as applied to Kimberli's situation, the plain

16

language of the statute leads inexorably to the conclusion that if she was "placed" as that term is meant to be understood, then MSD remains financially liable for her public education — not because federal law requires that result, but because state law imposes that obligation.

However, the parties have not had an opportunity to fully brief the proper construction of the various iterations of "placed" as the term is used in the statute. Ascribing usual and common meaning to the term probably leads to one result, while finding ambiguity and resorting to legislative history, or other interpretive methods, may lead to another. There also may well be more available by way of legislative history than the court has been able to find on the subject. Certainly, nothing in the statute itself compels a construction that would read into the term restrictions like, "by the division of children and youth" or "by a state court of competent jurisdiction," but some

17

language might vaguely suggest such restrictions.[5]  <u>See, e.g.,</u> RSA 193:29, IV.  The parties, in fairness, should be afforded the opportunity to fully research and present their views on this potentially dispositive point before it is resolved.

Another undeveloped issue suggests itself as well.  It may be that MSD is administratively estopped, in this case at least, from challenging the validity of Kimberli's placement.  That is, even if the statutory scheme is construed to mean that a "placement" in a home for children triggers a child's right to attend local schools where the home is located only when the placement has been directed by the state, MSD may not be permitted to claim at this late date that Kimberli was <u>not</u> placed by the state.  MSD may be estopped from making that claim because it apparently did not raise that issue in 1992, when it first contested its financial liability.

---

[5]  References to brief comments in the legislative history related to 1998 amendments to the statute are unhelpful because they do not purport to explain the term "placed" as used in connection with "homes for children," but instead speak to state placements in "the home of a relative or friend," an entirely different circumstance raising entirely different issues (like athletic recruitment, for example).

18

In order for the NHDOE to have found MSD liable for Kimberli's public education costs in 1992, it necessarily had to first find that 1) Kimberli was placed in a home for children in Pittsfield within the meaning of RSA Ch. 193; 2) Kimberli (and her parents) were residents of MSD, the sending district, immediately before she began residing in the home; and 3) she was not placed in the home "solely for the purpose of enabling a child residing outside said district to attend such schools." RSA 193:28. Otherwise, MSD could not have been held liable as the sending district. If MSD could have, but did not challenge the propriety of Kimberli's "placement" (e.g., on grounds that the placement was voluntary, and not state-directed) when it first challenged the liability determination, it may be administratively, or defensively, estopped from making that challenge now. See, e.g., Farm Family Mutual Insurance Co. v. Peck, 143 N.H. 603 (N.H. 1999); Bath Iron Works Corp. v. Director OWCP, U.S. Dept. Labor, 125 F.3d 18 (1st Cir. 1997). But, that issue also has not been fully briefed by the parties, and it, too, may be outcome determinative.

19

## Conclusion

The pending cross-motions for summary judgment (documents no. 56, 58 and 60) are denied without prejudice. Plaintiff, MSD, shall show cause, by memorandum of law, filed on or before May 18, 2001, why the hearing officer's decision should not be affirmed, that is, by pointing to a genuine issue of material fact relative to the qualifying nature of Kimberli's placement; demonstrating that the term "placement" (and its variations) as used in the statute and as applied to Kimberli's situation means the equivalent of "placed by the state;" and, by showing that it is not estopped from now arguing that Kimberli was not placed "by the state," if that construction of the term is required. Within 30 days of plaintiff's filing its memorandum, Defendants Crisman and Town of Pittsfield may respond, if necessary.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 26, 2001

cc:  Dean B. Eggert, Esq.
     Lynne J. Zygmont, Esq.
     Jay C. Boynton, Esq.
     Jed Z. Callen, Esq.